| | | |
|---|---|---|
| **GREAT LAKES INSURANCE SE** | : | **Case No. 2:19-cv-04466-GEKP** |
| *Plaintiff* | : | |
| **Vs.** | : | |
| **RAIDERS RETREAT REALTY CO, LLC** | : | |
| *Defendant* | : | |

**DEFENDANT RAIDERS RETREAT REALTY CO., LLC'S**
**SUPPLEMENTAL RESPONSE IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Defendant, RAIDERS RETREAT REALTY CO, LLC ("Defendant" or "Raiders"), by and through its attorneys, Goldstein Law Partners, LLC, hereby submits the following Supplemental Response in Opposition to the Motion for Summary Judgment filed by Plaintiff, GREAT LAKES INSURANCE SE ("Plaintiff" or "Great Lakes"). The scope of Great Lakes' Motion for Summary Judgment is narrow. It contends that, prior to the loss, Raiders breached the express warranty under Article 9, Section (k) of the policy of insurance ("Policy") by failing to recertify or re-tag the fire extinguishing equipment onboard the Viking Motor Yacht. Accordingly, If Raiders breached the express warranty, the Policy would be void *ab initio* and Great Lakes could freely deny coverage for the loss incurred. *See* Fed. R. Civ. P. 56(a).

Great Lakes' argument relies upon the faulty premise that the Policy's express warranty provision under Article 9, Section (k) required "certification/tagging" of the fire extinguishing equipment on an annual basis. *See* Ex. B (Policy at 11 of 14 ¶9(k)). The plain language of Article 9, Section (k), however, does not contain this requirement. Rather, Raiders "warranted that such [fire extinguishing] equipment [wa]s properly installed and [wa]s maintained in good

working order." *Id*. The record contains no facts – not even an insinuation – that any of the fire extinguishers on board the Vessel malfunctioned or were inoperative. Great Lakes denied coverage and has now moved for Summary Judgment solely on the basis of whether *all* eighteen (18) fire extinguishers on board Raiders' Vessel had been annually "certifi[ed]/tagg[ed]" – even though the express warranty language under Article 9, Section (k) contains no such prerequisite.

The Motion filed by Great Lakes is devoid of merit and should be promptly denied. The factual record indicates that Raiders complied with the express language contained in Article 9, Section (k) of the Policy, the Findings and Recommendations of the 2016 Nikula Survey Report, and the manufacturer's written materials for properly maintaining the fire extinguishing equipment. And Great Lakes makes no allegations to the contrary. Instead, Great Lakes wrongly denied coverage based upon an erroneous interpretation of the Policy's express warranty – an interpretation that was ostensibly designed to discriminate against the insured and create a basis upon which to deny coverage.

Raiders respectfully requests that this Court deny Great Lakes' Motion for Summary Judgment. The record contains genuine disputes of material fact.

## I.   INTRODUCTION AND PROCEDURAL HISTORY

Great Lakes filed a Declaratory Judgment Action in the Eastern District of Pennsylvania against Raiders on September 25, 2019, seeking (i) to establish that Raiders committed a material breach of the marine insurance policy issued, and (ii) to vindicate the insurer's decision to deny coverage. ECF No. 1 (Compl., 9/25/2019). Raiders responded with an Answer, Affirmative Defenses and Counterclaims. ECF No. 5 (Raiders Answer & Counterclaims, 12/6/2019). Specifically, Raiders alleged the following causes of action against Great Lakes: (1) breach of

contract; (2) breach of the implied covenant of good faith and fair dealing; (3) breach of fiduciary duty; (4) bad faith liability under 42 Pa. C.S.A§8371; and (5) Violation of the Unfair Trade Practices and Consumer Protection Law, 73 P.S. §201-1 *et seq*. On January 9, 2020, Great Lakes filed an Answer to Raiders' Counterclaims. ECF No. 6 (Great Lakes Answer, 1/9/2020).

Thereafter, on January 22, 2020, Great Lakes incorrectly filed a Motion to Dismiss Counts Three and Four of the Counterclaims under Rule 12(b), with a "corrected" Motion to Dismiss on February 20, 2020, to include Count Five. *See* ECF No. 8 (GLI's Motion to Dismiss, 1/22/2020); ECF No. 12 (GLI's 'Corrected' Motion to Dismiss, 2/20/2020). Raiders filed Answers and Response Briefs to both. *See* ECF No. 14 (Raiders Opposition, 2/21/2020); ECF No. 15, (2/24/2020).

On February 25, 202, after argument, this Honorable Court dismissed the Motion to Dismiss without prejudice and granted leave to Plaintiff to file this Motion for Judgment on the Pleadings. ECF 16 -17 (Orders, 2/26/2020). Raiders then filed a Response and Memorandum of Law in Opposition to Great Lakes' Motion under Rule 12(c). *See* ECF No. 20 (Raiders' Opposition, 3/13/2020). Great Lakes responded with a request for leave to file a reply (ECF No. 22) on March 26, 2020, and Raiders countered with a motion seeking leave for a sur-reply (ECF No. 23) on April 8, 2020.

Ultimately, on December 11, 2020, this Court issued an order ("December Order") scheduling oral argument on January 7, 2020, regarding Plaintiff's Motion for Judgment on the Pleadings. *See* ECF No. 34 (Order, 12/11/2020). The December Order specified this Court "will also afford the parties an opportunity to present evidence on the issue of which state's law should be applied in the above- referenced matter." *Id*. According to this Court, "[C]hoice of law is a legal question for the court to resolve, which, however, may require resolution of disputed facts."

*Id.* at n.1 (quoting *Toll v. Tannenbaum*, 982 F. Supp. 2d 541, 548 (E.D. Pa. 2013) (Robreno, J.), *aff'd*, 596 F. App'x 108 (3d Cir. 2014)). Under Fed. R. Civ. P. 12(d), if the court considers "matters outside the pleadings" on a motion under Rule 12(c), "the motion must be treated as one for summary judgment under Rule 56[,]" and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."

Following Oral Argument on January 7, 2021 (ECF No. 39), Raiders and Great Lakes submitted additional filings, including memoranda and affidavits concerning whether Great Lakes maintained a substantial connection with New York. *See* ECF No. 43 (Great Lakes Memorandum and Affidavits, 1/22/2021); ECF No. 44 (Raiders' Memorandum and Affidavits, 2/1/2021).

On February 22, 2021, this Court entered an Order and Memorandum Decision that, *inter alia*, dismissed with prejudice Counts III, IV and V from Raiders' Counterclaims. ECF No. 52 (Order, 2/22/2021); ECF No. 51 (Memorandum Decision, 2/22/2021). On March 8, 2021, Raiders filed a Motion under Fed. R. Civ. P. 59(e), asking this Court to alter or amend the February Order. *See also* L.R. 7.1(g). The Court promptly dismissed Raiders' Motion.

Great Lakes filed this Motion for Summary Judgment on March 19, 2021.[1] On April 21, 2021, Raiders submitted a Response in Opposition to Great Lakes' Motion. ECF No. 63 & 63-1. Thereafter, the District Court entered a stay order pending resolution of Raiders' appeal to the Third Circuit. The stay remained in effect through the appellate process. Following the Decision by the U.S. Supreme Court, it matter was remanded to Third Circuit. The parties' Summary Judgment Motions pending in the Eastern District of Pennsylvania are now ripe for

---

[1] On March 22, 2021, Raiders filed its own Motion for Partial Summary Judgment under Rule 56 of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 56.

decision. On April 1, 2024, following a status conference, this Court issued a briefing schedule that allowed both parties to submit supplemental briefing. ECF No. 79 (Order, 4/1/2024).[2]

## II.     AMENDED COUNTER STATEMENT OF UNDISPUTED FACTS

Commencing in 2007, and continuing through 2019, Plaintiff Great Lakes Insurance SE ("Great Lakes") issued a policy of insurance covering a 1988 70-ft Viking Motor Yacht vessel (the "Vessel") owned by Defendant Raiders Retreat Realty Co., LLC ("Raiders"), with a policy number CSRYP/171163. Phillip Pulley ("Pulley") is the owner and sole member of Raiders Realty Co., LLC Great Lakes renewed the coverage afforded to Raiders under the original policy of insurance for every year from 2007 up to and including 2018. Great Lakes also extended the insurance policy for the protection of the Vessel to 2019.

As part of the renewal process in 2016-2017, Nikula Marine Services ("Nikula") performed a survey of the condition and valuation of the Vessel on October 18, 2016. On October 20, 2016, Nikula issued its report ("Nikula 2016 Survey") and specified only two "Findings and Recommendations," as follows:

**FINDINGS & RECCOMMENDATIONS**  [sic]

Priority 1 recommendations:

*Halon system, service and date tag.
*Fire extinguishers, purchase and store aboard.

Ex. A (Nikula 2016 Survey at 26 of 27); *see* ECF No. 1 at 52 of 82. At the time of the Nikula 2016 Survey, the Vessel had installed on board a Halon 1301 fire suppression system. Ex. A (Nikula 2016 Survey at 22 of 27); *see* ECF No. 1. At the time of the Nikula 2016 Survey, the Vessel carried a total of thirteen (13) fire extinguishers aboard and in good working order. Ex. D

---

[2] All references to Exhibits correspond to the Exhibits attached to Raiders' original Response in Opposition (ECF No. 63), as well as its Partial Motion for Summary Judgment (ECF No. 57)).

(Pulley Dep., N.T., 9/23/2020, at 33: 10-15 & 34: 2-13). Pulley added five (5) fire extinguishers in 2016 to the Vessel's on board compliment, following the Nikula 2016 Survey, for a total of eighteen (18) fire extinguishers. *Id*. at 33: 10-15 & 34: 2-4. Pulley purchased five (5) additional fire extinguishers to increase the Vessel's compliment and to make a good faith effort to comply with the recommendation. *See* Ex. H, Pulley Declaration, 5/6/2024, at ¶¶10-12.

The second recommendation in the Nikula 2016 Survey identified the "Halon system" and directed Raiders to "service and date tag" the system. *Id*. at ¶13. According to the United States Coast Guard ("USCG"), the Halon 1301 fire suppression system is obsolete and the fire fighting agent used in the system was terminated in January 1, 1994.

> **162.035 HALON 1301 TYPE FIRE EXTINGUISHING SYSTEM (OBSOLETE) APPROVAL GUIDANCE & INFORMATION:** The production of Halon 1301 fire fighting agent was terminated effective January 1, 1994, and the installation of new halon systems on SOLAS ships prohibited. *However, existing systems may be retained if in good and serviceable condition.*

Ex. E (USCG Issued Guidance and Information, URL: www.uscg.mil/ (last visited, March 22, 2021) (emphasis added). The Nikula 2016 Survey did not find that the Vessel's Halon 1301 fire suppression system is not "in good and serviceable condition[,]" or that it could not be retained. When the Nikula 2016 Survey was issued, **it was not possible to "service and date tag" the Vessel's Halon 1301 fire suppression system** because it is "OBSOLETE," as designated by the USCG. *See* Ex. E (USCG Issued Guidance and Information); Ex. D (Pulley Dep., N.T., 9/23/2020, at 33: 16-19). Pully could not have had the Halon System "service[d] and date tag[ged]" because no outside vendor or independent inspector was permitted to do so following the pronouncement and guidance issued by the USCG. *See* Ex. H, Pulley Declaration, 5/6/2024, at ¶17.

The Halon manufacturer's recommendations require that the tanks be weighed once annually. Ex. D (Pulley Dep., N.T., 9/23/2020, at 57: 24-25 - 58: 1-11); Ex. F (Halon 1301 Manufacturers Materials). Pulley weighed the tanks once annually in April, in compliance with the manufacturer's recommendations; except, in 2016, Pulley weighed the tanks twice. *Id.* In the course of his boat check each year, Pulley would weigh the tanks and confirm "all the fire extinguishers were still good" and in working order – which included the Halon system fire extinguisher. *Id.* at 58: 17-25; *See* Ex. H, Pulley Declaration, 5/6/2024, at ¶20. Pulley maintained all fire extinguishers "in good working order" as required by Article 9, Section (k) of the Policy, and thus he ensured that Raiders did not violate any express warranty provisions within the Policy of Insurance. *See* Ex. B (Policy at 11 of 14 ¶9(k)); *See* Ex. H, Pulley Declaration, 5/6/2024, at ¶21.

The USCG requires vessels of the same size and type as the Viking Motor Yacht owned by Raiders to carry four (4) fire extinguishers aboard. At the request of Great Lakes during the renewal process for policy number CSRYP/171163, on October 26, 2016, Raiders completed and returned Great Lakes' form letter for compliance regarding the recommendations made by the Nikula 2016 Survey report ("October 2016 Compliance Letter"). Ex. C (Raiders Compliance Letter, 10/26/2016). Pulley signed and returned the October 2016 Compliance Letter on Raiders' behalf within six (6) days of the Nikula 2016 Survey report. On behalf of Raiders, Pulley wrote "N/A" below the column of the October 2016 Compliance Letter labeled "Outstanding Recommendations." In writing "N/A" on October 2016 Compliance Letter, Pulley did not cause Raiders to make any misrepresentations to Great Lakes. *See* Ex. H, Pulley Declaration, 5/6/2024, at ¶21.

The October 2016 Compliance Letter specifies that the two "Findings and Recommendations" under the Nikula 2016 Survey do not apply to the Vessel. First, the Vessel already had thirteen (13) fire extinguishers aboard and all were maintained in good working order. *See* Ex. H, Pulley Declaration, 5/6/2024, at ¶28. Aside from the Halon system fire extinguisher, Nikula 2016 Survey did **not recommend** that any of the other fire extinguishers aboard the Vessel required servicing or date tagging. *Id*. at ¶29. Second, as specified above, the Nikula 2016 Survey made a recommendation about the Halon system that **did not apply** based on the pronouncement and guidance from the USCG. *Id*. at ¶30. While the Halon system could be retained so long as it was in good working order, the system was "OBSOLETE" and could no longer be "service[d]" or "date tag[ged]." *Id*. at ¶31. In making the notation "N/A," I intended to answer the October 2016 Compliance Letter in a complete and truthful manner. *Id*. at ¶32.

The October 2016 Compliance Letter did not identify any contractors (or others) who performed work on the Vessel because, as I indicated previously, no work was required by the recommendation in the Nikula 2016 Survey. *Id*. at ¶33. With compliance letters in prior years, Pulley clearly delineated the identity of the individuals who performed work needed to comply with survey recommendations. Pulley did not identify any such individuals in the October 2016 Compliance Letter because, for the reasons specified above, the Nikula 2016 Survey did not require work to be performed. *Id*. at ¶34. Nine (9) days after Raiders sent the October 2016 Compliance Letter to the underwriters for Great Lakes, Great Lakes renewed the policy coverage for Raiders' Vessel on November 5, 2016, without any further contact or inquiry with the insured or its broker.

Great Lakes renewed Raiders' policy coverage for the Vessel after receiving the October 2016 Compliance Letter, which noted "N/A" on the chart column for "Outstanding

Recommendations." Great Lakes accepted the renewal of Raiders' policy coverage after Raiders' October 2016 Compliance Letter communicated that the two recommendations in the Nikula 2016 Survey **did not apply**. *See* Ex. H, Pulley Declaration, 5/6/2024, at ¶37. The October 2016 Compliance Letter, which I executed on behalf of Raiders, did not contain any misrepresentations or lies; rather, it communicated to Great Lakes that neither recommendation required action. *Id*. at ¶38. I did not cause Raiders to suggest or insinuate to Great Lakes that certain actions had been taken, when – in fact – such actions had not been completed. *Id*. at ¶39.

Raiders continued to file renewal applications each year following 2016. Raiders completed a renewal compliance survey on October 8, 2018, for the 2018-2019 policy year. The renewal application included filling out a renewal questionnaire, but nothing in the 2018 renewal questionnaire inquired about the fire suppression system aboard the Vessel or compliance with any survey recommendations. Great Lakes issued the specific policy in question, the "Private and Pleasure Yacht Insuring Agreement (the "Policy"), in October or November 2018; the Policy was signed only by Great Lakes. Ex. B (Great Lakes Insurance Policy, No. CSRYP/171163, 11/5/2018).

Article 9 of the Policy, entitled "General Conditions and Warranties," provides the following under Section (k):

> **If** the Scheduled Vessel is fitted with fire extinguishing equipment, then it is *warranted that such equipment is properly installed and is maintained in good working order*. This includes *the **weighing** of the tanks once a year*, certification/tagging and recharging **as necessary**. (Emphasis supplied).

Ex. B (Policy at 11 of 14 ¶9(k)) (emphasis added). Article 9 of the Policy, entitled "General Conditions and Warranties," provides the following under Section (r):

> Unless we agree in writing to the contrary, if we request a survey of the Scheduled Vessel then it is warranted that such survey is in existence prior to the

effective date of this insurance and a copy of the same must be received my us within 30 days of the effective date of this agreement. If the survey makes any recommendations with respect to the Scheduled Vessel, then it is warranted that all such recommendations are completed prior to any loss giving rise to any claim hereunder, by skilled workman using fit and proper materials and that either:

1) The Surveyor who carried out the survey certifies in writing that all recommendations have been completed to his (the surveyors) satisfaction prior to any loss and/or claim

   Or,

2) The workmen/repair yard that carried out the said work and/or recommendations certifies in writing that all recommendations have been completed prior to any loss and/or claim. Failure to comply with this warranty will void this agreement from inception.

*Id*.

On June 7, 2019, the Vessel sustained significant damage when it became grounded and took on water. No fire occurred and none of the damage was sustained as a result of a fire. The amount of damage to the Vessel exceeds Three Hundred Thousand Dollars ($400,000.00). Raiders filed a timely claim for coverage of the loss to the Vessel with Great Lakes, reporting the claim directly to Christi Insurance Group. Ex. D (Pulley Dep., N.T., 9/23/2020, at 38-39). Since 2007 through 2019, Raiders paid the annual premiums, in excess of $109,000, and filed no claims and incurred no losses until the June 7, 2019 accident when the Vessel ran aground.

On September 10, 2019, Plaintiff's underwriters, Concept Special Risks, Ltd. ("Concept") sent Raiders a notice of non-renewal, explaining that the insurer elected not to renew the Policy as a result of Raiders' claim filed in June 2019. By letter dated September 25, 2019, Great Lakes, by and through its underwriter and claims agent Concept, denied coverage of the validly filed claim for loss ("Denial Letter"). In the Denial Letter, Concept explained the grounds under which Great Lakes chose to deny the claim: (i) that Raiders violated "express

warranty" contained in Article 9, Section (k) of the 2018 Policy, and (ii) that Raiders made a **material** misrepresentation in its October 2016 Compliance Letter signed by Pulley. Based upon the two grounds cited in the Denial Letter, Great Lakes denied the claim and voided the Policy from its inception.

## III.   MOTION STANDARD

Under Federal Rule of Civil Procedure 56, Raiders shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Where, as here, a case involves pure questions of law with no material factual disputes, the case is "suitable for resolution by summary judgment." *See Elf Atochem N. Am. v. United States*, 866 F. Supp. 868, 870 (E.D. Pa. 1994). The non-moving party cannot defeat a properly supported motion for summary judgment through mere allegations or denials but must set forth specific facts showing that there is a genuine dispute for trial. *See* Fed. R. Civ. P. 56. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249.

## IV.   ARGUMENT

### A.   Raiders Did Not Breach the "Express Warranty" Contained under Article 9, Section (k) of the Policy.

Great Lakes concludes that Raiders breached an "express warranty" contained under Article 9, Section (k) of the Policy for one reason: the certification tags for the Viking Motor

Yacht's fire extinguishers and Halon fire suppression system expired in May 2015. ECF No. 56 (GLI's Motion for Summary Judgment, 3/19/2021, at 2); *see also* ECF No. 1 (Compl., 9/25/19, at ¶¶ 38-39, 41). Great Lakes interprets Article 9, Section (k) – the so-called "fire extinguishing equipment warranty" – as mandating that Raiders recertify and retag the equipment on an annual basis. ECF No. 56 at 8. Raiders' purported breach of express warranty – Great Lakes contends – voided the Policy *ab initio* from its inception. *Id*. at 8-9. Great Lakes therefore argues that, because the Policy "affords no coverage for the loss" incurred to Raiders' Vessel, it is entitled to summary judgment. *Id.* at 2.

The argument is simple, succinct and wrong. It relies upon an erroneous assumption, which Great Lakes tacitly acknowledges but largely ignores. The express language of the warranty under Article 9, Section (k) does **not require** that the fire extinguishing equipment aboard Raiders' Vessel be certified or retagged. Ex. B (Policy at 11 of 14 ¶9(k)) Rather, the reference to "certification/tagging" is illustrative only and **subject to the limiting qualifier "as necessary,"** which is undefined in the Policy. In fact, no language in Article 9, Section (k) asks Raiders to warrant that the fire extinguishing equipment be certified or tagged in the first instance. Raiders "warranted that such [fire extinguishing] equipment [aboard the Vessel] **[wa]s properly installed and [wa]s maintained in good working order**." Ex. B (Policy at 11 of 14 ¶9(k)) (emphasis added). The facts demonstrate that Raiders' fire extinguishing equipment complied with its warranty obligations, despite Great Lakes disputed allegations to the contrary.

Great Lakes **does not** contend that Raiders breached the *actual* express warranty language under Article 9, Section (k) – that the equipment was improperly installed or failed to operate in some fashion. No facts in the record would support such an allegation. Great Lakes instead chooses to concentrate only upon whether certain indicia of the warranty were absent.

Such facts, even if undisputed, are not adequate to satisfy its burden. Certification and retagging was not mandated by the express warranty provision under Article 9, Section (k). *See* Ex. B (Policy at 11 of 14 ¶9(k)). Great Lakes is not entitled to summary judgment for breach of an express warranty where it fails to cite *any* facts establishing that Raiders breached the warranty obligation itself.

1. <u>*Legal Standard for Interpreting Article 9, Section (k) of the Policy*</u>

The language used in this provision defines the limits of the "express warranty," which Great Lakes relied – in part – upon to deny coverage for Raiders' Vessel. The precepts of construction under both New York law and entrenched federal admiralty law reveal that Great Lakes employs a specious interpretation of Article 9, Section (k) to support its Motion for Summary Judgment.

New York law controls the construction and application of Great Lakes Insurance Policy – including Article 9, Section (k) – except to the extent federal admiralty law conflicts. *See Commercial Union Ins. Co. v. Flagship Marine Servs., Inc.*, 190 F.3d 26, 30 (2d Cir.1999) ("There is no specific federal rule governing the construction of marine insurance contracts."); *Great Lakes Ins. SE v. Andersson*, 66 F.4th 20, 26 (1st Cir. 2023) (recognizing "[t]here is no federal maritime rule governing construction of marine insurance contracts," and applying state law to interpret the provisions of the insurance contract). New York law shall determine "the scope and validity" of the Policy, including "the consequences of breaching [any provision therein]." *Advani Enters. v. Underwriters at Lloyds*, 140 F.3d 157, 163 (2d Cir.1998) (internal quotations omitted). While New York law governs the interpretation of "this insuring agreement" and its provisions, "only contract-related claims are subject to the substantive laws of New York" under the choice-of-law clause contained in the Policy. *Andersson*, 66 F.4th at 28.

13

"Extracontractual claims do not fall within the scope of the second clause of the choice-of-law provision." *Id.* (interpreting the scope of an identical choice-of-law provision contained in a Great Lakes maritime insurance policy).

Under New York law, contract interpretation begins with the plain language of the agreement.

> And as a matter of contract interpretation—as with statutory construction—the Court begins with the plain text of the term at issue. *See, e.g.*, *Ment Bros. Iron Works Co. v. Interstate Fire & Cas. Co.*, 702 F.3d 118, 122 (2d Cir. 2012) (interpretation of insurance contracts under New York law); *United States v. Am. Soc. of Composers, Authors, Publishers*, 627 F.3d 64, 72 (2d Cir. 2010) (statutory construction).

*Starr Indem. & Liab. Co.*, 320 F. Supp. at 568. To ascertain the meaning of a particular contractual term, courts consult the common meaning of such terms. *See id.* at 569 (using *Merriam Webster*'s online dictionary to define the terms "substantial threat" and "significant risk"). "The initial interpretation of a contract is a matter of law for the court to decide." *K. Bell & Assocs. v. Lloyd's Underwriters,* 97 F.3d 632, 637 (2d Cir. 1996) (citation omitted). In doing so, the court must ascertain "whether the terms of the insurance contract are ambiguous." *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's,* 136 F.3d 82, 86 (2d Cir. 1998). "Whether [ ] a writing is ambiguous is a question of law to be resolved by the courts." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.,* 375 F.3d 168, 178 (2d Cir. 2004).

The court "should assign the plain and ordinary meaning to each term" of the marine insurance Policy at issue, if it determines the provisions of the Policy are "clear and unambiguous[.]" *Int'l Multifoods Corp. v. Commercial Union Ins. Co.,* 309 F.3d 76, 83 (2d Cir. 2002). "**If an insurance policy is ambiguous, all ambiguity must be resolved in favor of the**

**policy holder**....” *Hartford Fire Ins. Co. v. Mitlof,* 208 F.Supp.2d 407, 412 (S.D.N.Y. 2002) (emphasis added).

> “An ambiguity exists where the terms of an insurance contract could suggest ‘more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.’ ”

*Great Lakes Reinsurance (UK) PLC v. Kranig*, 2013 WL 2631861, at *8 (D.V.I. 2013) (quoting

*Morgan Stanley Group, Inc. v. New Eng. Ins. Co.,* 225 F.3d 270, 275 (2d Cir. 2000)).

> 2.   *The plain language of Article 9, Section (k) Warrants that the Fire Extinguishing Equipment must be "Properly Installed and ... Maintained in Good Working Order" – Not that it be Certified or Tagged Annually.*

The plain language contained the first sentence of Article 9, Section (k) includes the express warranty and is clear and unambiguous.  Raiders must properly install and maintain the fire extinguishing equipment "in good working order," and the record contains no dispute that Raiders complied.  *See* Ex. B Great Lakes Insurance Policy, No. CSRYP/171163, 11/5/2018).

> If the Scheduled Vessel is fitted with fire extinguishing equipment, then it is **warranted that such equipment is properly installed and is maintained in good working order**. This includes the weighing of the tanks once a year, certification/tagging and recharging as necessary.

Ex. B (Policy at 11 of 14, ¶9(k)) (emphasis added).  As a threshold matter, the warranty applies only if the vessel "is fitted with fire extinguishing equipment[.]"  *Id.*  The provision does not require Raiders, as the insured, to install any such equipment in the first instance.  The insured must simply warrant that it will perform certain routine maintenance on the equipment, once installed.

The first sentence delineates the requirements of the express warranty: (i) to install the equipment properly and (ii) to maintain it "in good working order."  *Id.*  A strict construction of this express warranty language demands nothing additional from Raiders, as the insured.  The

second sentence of Article 9, Section (k) merely provides illustrative examples that help to define the warranty obligation. The argument advanced by Great Lakes would force this Court to conclude that the second sentence imposes additional warranty requirements upon the insured – requirements separate and apart from those specified under the express warranty language of the first sentence. The structure and text of Article 9, Section (k) does not support Great Lakes' interpretation.

The language specifies that the warranty "includes weighing of the tanks once a year" and "certification/tagging and recharging *as necessary*." *Id*. (emphasis added). It lists specific examples of action items that *may* be required for the insured to comply with the warranty under Article 9, Section (k), and *temporal modifiers for when those actions are required*. *Id*. The insured *must* weigh the tanks of all fire extinguishing equipment installed aboard the vessel once annually. The language explains that failure to do so would constitute an express breach of warranty.

The final subordinate clause – "certification/tagging and recharging *as necessary*" – doe not impose the same mandate upon Raiders. Great Lakes treats the reference to "certification/tagging" as creating the same obligation upon the insured as "weighing of the tanks once a year." But the plain language **does not apply** the "once a year" requirement to "certification/tagging." Great Lakes' construction of Article 9, Section (k) makes it necessary for the insured *per se* to "certif[y]/tag[]" the fire extinguishing equipment on an annual basis, and that any expiration of such "certification/tagging" constitutes an express breach of warranty. This reading, however, misconstrues the text of the second clause, and imposes a requirement upon the insured that does not exist.

***The Record does not Demonstrate that Certifying or Tagging the Fire Extinguishing Equipment was "Necessary" in order to Adhere with the Express Warranty under Article 9, Section (k).***

Contained in the last sentence of Article 9, Section (k), the "***as necessary***" language qualifies the requirements for "certification/tagging" and for "recharging[.]" Ex. B (Policy at 11 of 14, ¶9(k)). Great Lakes disregards this phrase. The warranty under Article 9, Section (k) does not require the insured to perform these identified tasks *unless* "necessary[.]" *Id*. Accordingly, for Great Lakes to prevail on their Motion and thus establish that Raiders breached the express warranty as a matter of law, the undisputed facts must establish that "certification/tagging" *all* fire extinguishing equipment annually was "necessary." Great Lakes has failed to make this showing.

How the Policy defines the term "necessary" sets the parameters for Raiders' compliance with the express warranty under Article 9, Section (k). The Policy does not contain an express definition that delineates the specific meaning for the terms "necessary" or "as necessary," as used within Article 9, Section (k). The Merriam-Webster Online Dictionary defines the adjective "necessary" as "**absolutely needed**" or "**required**." *See Merriam-Webster Online Dictionary*, (URL: https://www.merriam-webster.com/dictionary/necessary2021, last visited Mar. 22, 2021); *see Starr Indem. & Liab. Co.*, 320 F. Supp. at 569. Under this definition, the insured must perform the "certification/tagging" when "needed" or "required" to do so. This definition signals the prerequisite for an external triggering event or independent source to identify the need, if any, for "certification/tagging" of the equipment. By implication, the definition also signifies that "certification/tagging" is **not required** of the insured in all circumstances. Some outside force must identify and explain the need to certify and/or tag when it arises. Otherwise, the plain language of Article 9, Section (k) does not – itself – categorize

"certification/tagging" as a necessary requirement.  This interpretation would be consistent with the insurer's requirement that the insured obtain an inspection survey at certain intervals – such as the Nikula 2016 Survey – and comply with any recommendations delineated.

The term "as necessary" should not be construed as simply requiring the insured to recertify or re-tag the fire extinguishing equipment once annually.  This reading would violate the fundamental tenets of contract interpretation.  It would imbue "as necessary" with the same meaning as the language qualifying the insured's obligation to weigh the tanks of the fire extinguishing equipment "once a year[.]"  The use of different language signals the intent to convey a different meaning.

Similarly, the mere expiration of a prior "certification/tagging" cannot unilaterally trigger the "as necessary" requirement – and, thus, render an insured's failure to recertify or re-tag as a breach of warranty.  The "as necessary" language must trigger the original need for "certification/tagging" in the first instance; otherwise, an absurd result could ensue.  Article 9, Section (k) does not impose a blanket uniform requirement that the insured certify or tag the equipment.  Great Lakes ignores this fact and, instead, maintains that allowing any prior "certification/tagging" to expire constitutes a breach of express warranty under this provision. Under this reading, an insured would breach this express warranty where (i) the insured chose to certify or tag the equipment, even though it was not necessary to do so; and (ii) the "certification/tagging" subsequently expired.  This interpretation ignores the "as necessary" qualifying language, and presumes that the warranty uniformly mandates "certification/tagging" for all fire extinguishing equipment – which the warranty's language does not require.

The plain language of Article 9, Section (k) belies Great Lakes' proffered construction. The language does not impose a *per se* obligation upon the insured to certify or tag any

equipment. The insured must do so "as necessary[,]" which raises the obvious question. When is it necessary under Article 9, Section (k) for the insured to certify or tag the fire extinguishing equipment? Substantial questions of material fact remain in dispute about *when* the express warranty deems "certification/tagging" to be "necessary[,]" and *whether* those circumstances are present in the instant case.

<blockquote>

3. *A Genuine Dispute of Material Fact Exists as to whether Raiders Complied with its Obligations under the Express Warranty contained in Article 9, Section (k) of the Policy.*
</blockquote>

The record does not indicate that Great Lakes ever determined Raiders failed to "properly install[]" or failed to "maintain[] in good working order" either the Halon 1301 fire suppression system or the eighteen (18) individual fire extinguishers aboard the Viking Motor Yacht. *See e.g.*, ECF Nos. 1 & 56. Arnold and Arnold, the surveyor who conducted the investigation of Raiders' claim, identified that the service tags had expired on the Vessel's Halon System and onboard fire extinguishers. *See* ECF No. 56-1 (GLI's Exhibit 3 (Arnold and Arnold Report, 8/5/2019, at 3-4)). Great Lakes attached to its Motion a copy of the surveyor's report dated August 5, 2019. *Id*. In this report of the investigation, the surveyor does not observe that any of the Viking Motor Yacht's fire extinguishing equipment was improperly installed or non-operational. *Id*.

Instead, Great Lakes solely relies upon the second sentence in Article 9, Section (k) and its erroneous interpretation of the language contained therein and discussed above. *See* ECF 56 (GLI's Brief at 8-9). "The evidence is undisputed and irrefutable[,]" Great Lakes contends, "that the Vessel's fire extinguishers and Halon fire suppression system had not been recertified and retagged in 2015, 2016, 2017, or 2018." *Id*. at 8 (citing Ex. 4 and Ex. 5). Great Lakes omitted from its argument, however, any discussion of whether such "certification/tagging" was

"necessary" for Raiders to perform in order to satisfy its warranty obligations. Great Lakes disregards this consideration and asks this Court to do so, as well. The record before this Court, nevertheless, contains numerous facts that reveal a deep and genuine dispute about whether Raiders breached the express warranty under Article 9, Section (k).

> ### a. Ample Facts Demonstrate that "[re]certification/[re]tagging" of the Vessel's Fire Extinguishers was Not "Necessary" under Article 9, Section (k).

The record includes two external sources of authority that provide guidance to Raiders, as the insured, in determining when (or whether) "certification/tagging" of the onboard fire extinguishing equipment is "necessary" under Article 9, Section (k): (1) materials issued by the manufacturers of the fire extinguishing equipment; and (2) the recommendations issued from the Nikula 2016 Survey conducted at Great Lakes' behest during the renewal process in 2016-2017. *See* Ex. D (Pulley Dep., N.T., 9/23/2020, at 57: 24-25 - 58: 1-11); Ex. B Policy at 11 of 14, ¶9(r)); Ex. F (Manufacturers Materials for Fire Extinguishing Equipment). Both sources belie Great Lakes' claim that the undisputed facts establish that Raiders breached the express warranty.

### *Findings and Recommendations of the Nikula 2016 Survey*

The facts show that Raiders complied with the "Findings and Recommendations" of the Nikula 2016 Survey to the extent feasible. In addressing the onboard fire extinguishing equipment, the Nikula 2016 Survey offered an assessment of the necessary requirements with which Raiders must comply in order to satisfy the warranty obligations. The Survey also provided additional discussion that was not couched as a mandatory requirement, but that guided the insured on best practices.

Specifically, the Nikula 2016 Survey issued two "Findings and Recommendations" to Raiders, both relate to the fire extinguishing equipment:

**FINDINGS & RECCOMMENDATIONS** [sic]

Priority 1 recommendations:

*Halon system, service and date tag.
*Fire extinguishers, purchase and store aboard.

Ex. A (Nikula 2016 Survey at 26 of 27); *see* ECF No. 1 at 52 of 82. The first recommendation directs Raiders to "service and date tag" the Halon system. *Id*. Without dispute, the record indicates that this did not occur. The recommendation proved infeasible and, thus, compliance impossible. Raiders did not simply disregard the Nikula recommendation. Phillip Pulley, the sole owner and member of Raiders, explained that the Vessel's Halon 1301 system – commissioned in 1988 – had not been serviced or date tagged because "[i]t was unnecessary." Ex. D (Pulley Dep., N.T., 9/23/2020, at 33: 16-23). The Halon 1301 system is "OBSOLETE," according to the United States Coast ("USCG"). Ex. E (USCG Issued Guidance and Information, URL: www.uscg.mil/ (last visited, March 22, 2021). The Halon 1301 fire-fighting agent terminated production in 1994, and the USCG prohibited the installation of new Halon systems. *Id*.

The USCG continues to allow older vessels, like Raiders' Viking Motor Yacht, to retain Halon systems "if in good and serviceable condition." *Id*. Nonetheless, these systems cannot be serviced or tagged, as the fire-fighting agent used in the Halon 1301 system has not been produced since 1994. Importantly, the Nakula 2016 Survey never found that the Halon 1301 system was in anything but "good and serviceable condition." *See* Ex. A (Nikula 2016 Survey at 26 of 27); *see* ECF No. 1 at 52 of 82. Great Lakes cites several photographs captured during the surveyor's investigation of Raiders' claim of loss, which ostensibly reveal that the certification

tags on the equipment had expired.  *See* ECF 56-1 (Ex. 4 & Ex. 5).  Raiders does not dispute the validity of these photographs; however, these exhibits do not conclusively demonstrate that Raiders breached an express warranty in the Policy.  The Halon 1301 system is "OBSOLETE" and cannot be serviced or tagged, even though the USCG allows older vessels to continue employing these fire suppression systems so long as the equipment remains operational.  *See* Ex. E.  These facts present a genuine dispute about *whether* Raiders complied with the express warranty under Article 9, Section (k) – that is, whether it was "necessary" or possible to certify and/or re-tag the Halon 1301 system so long as it remained "in good working order."  This question cannot be decided on a motion for summary judgment.

The second Nikula recommendation directs Raiders to "purchase and store aboard [the Vessel]" fire extinguishers.  *Id*.  According to Pulley, at the time of the Nikula 2016 Survey, the Viking Motor Yacht carried a total of thirteen (13) fire extinguishers aboard and in good working order.  Ex. D (Pulley Dep., N.T., 9/23/2020, at 33: 10-15  & 34: 2-13).  In compliance with the second Nikula recommendation, Pulley "purchased" five (5) additional fire extinguishers in 2016 and "store[d] [them] aboard" the Vessel.  *Id*. at 33: 10-15 & 34: 2-4.  With these additions, the Vessel carried a total compliment of eighteen (18) fire extinguishers at the end of 2016.  *Id*.

**Q.      How many fire extinguishers did you purchase and store on board?**

A.      Five.

**Q.      How many did [the Vessel] already have at that time before you purchased the five?**

A.      Thirteen.

**Q.      So, doing my math, after that, it had 18 fire extinguishers on board?**

A.      That's correct.
          And according to the U.S. Coast Guard, it only should have – or it was only required to have four –

*Id*. at 34: 2-13. The plain language of the recommendation required nothing else of Raiders. It fully complied with the guidance from the Nikula 2016 Survey.

In particular, this second recommendation **does not** state – expressly or implicitly – that it was "necessary" for Raiders to certify or re-tag each of the individual fire extinguishers aboard the Vessel, so long as the equipment was maintained "in good working order." By extension, since Great Lakes does not require that a new survey be conducted every year prior to renewal, it is significant that the Nikula 2016 Survey makes no mention of any annual requirement to keep the "certification/tagging" current each year. The absence of a direct recommendation of this nature in the Nikula 2016 Survey further demonstrates that genuine factual questions exist concerning whether failure to recertify or re-tag the equipment on an annual basis – in fact – constitutes a breach of *express* warranty.

<u>*Materials from the Manufacturers of the Fire Extinguishing Equipment*</u>

The Owner's Manual for the Fireboy Automatic Halon 1301 System ("Halon 1301 Owner's Manual") describes the maintenance procedures required for keeping the equipment "in good working order." *See* Ex. F (Halon 1301 Owner's Manual at pp. 6-7). The guidance and instructions included in the Owner's Manual apply to both the fixed Halon 1301 System and the portable Halon 1211 fire extinguishers. *See* Ex. F (Halon 1301 Owner's Manual; Halon Pamphlet Manual for 1301 and 1211). The Manual specifies that the owner or operator is capable of inspecting and maintaining the System and provides guidance for doing so:

> …Remember the two most important requirements to assure full charge and reliability of your FIREBOY System are: 1. Visual inspection of the activator to determine if it has been activated. 2. Weighing, the only sure method of determining the contents of the Halon 1301 fire systems. NOTE: FIREBOY Systems are not required to be emptied and hydrotested at regular intervals as with some other types of systems. **With frequent and proper visual**

**inspections, your FIREBOY System will provide many years of reliable protection.**

*Id*. at 7 (emphasis added). It explains how to inspect the Halon System, particularly how to identify small leaks in the System and the need to replace the System immediately from the dealer or manufacturer if tiny air bubbles are detected. *Id*. Most importantly, the Owner's Manual specifies, "[a]ll **extinguishing systems are required to be periodically weighed t**o ensure a fully charged unit." *Id*. (emphasis added). "Weighing is the only safe method of determining that the system cylinder is fully charged with agent." *Id*. Notably, the Halon Owner's Manual does **not** impose a requirement that the System must be certified or tagged on regular intervals. Rather, it emphasizes the requirement that the owner or operator performing personal inspections and periodically weighing the tanks.

The deposition of Phillip Pulley demonstrates that he fully complied with these requirements delineated by the manufacturer's guidance, and that this guidance did not deem it "necessary" for the System to be recertified or retagged so long as the owner adhered to the manufacturers' guidelines. Pulley weighed the tanks once per year, as required by the manufacturers' directions. Ex. D (Pulley Dep., N.T., 9/23/2020, at 57: 24-25 - 58: 1-11); Ex. F (Halon 1301 Manufacturers Materials). This practice overlapped with the express requirements of the Policy's warranty under Article 9, Section (k). Pulley performed annual maintenance on all the Vessel's systems. During the course of his annual check of all systems, Pulley would confirm "all the fire extinguishers were still good" and in working order. Ex. D (Pulley Dep., N.T., 9/23/2020, at 58: 17-25). Pulley consulted the manufacturers requirements and guidelines in performing these annual compliance checks.

It is a disputed question of fact whether the warranty requires "certification/tagging" of the fire extinguishing equipment where no reason to do so arises during the course of normal

annual maintenance, like the maintenance Pulley performed. The manufacturer's materials do not appear to require such a "certification/tagging." *See* Ex. F (Halon 1301 Owner's Manual). And Great Lakes has not cited any portion of the record that renders it "necessary" to recertify or re-tag the equipment if it remains "in good working order."

The manufacturer's materials are, perhaps, the primary source of guidance that assist the insured in ascertaining when the express warranty under Article 9, Section (k) deems it "necessary" to certify or tag the onboard fire extinguishing equipment. The Halon 1301 Owner's Manual and the other materials published by the manufacturer do not expressly require this "certification/tagging" if the equipment is operational and passes the inspections and weighing by the insured.

Accordingly, Raiders and Pulley acted properly in complying with the manufacturing guidelines, which Raiders contends should satisfy the express warranty requirements that obligate it to maintain the equipment in "good working order."

## B. Raiders' Extra-Contractual Counterclaims Are Not Governed by New York Law.

Great Lakes has argued consistently that the scope of the contractual choice-of-law provision contained in the Policy applies New York law to Raiders' extra-contractual counterclaims, including the cause of action for bad faith denial of insurance coverage. During a status conference held on April 1, 2024, however, counsel for Great Lakes conceded that (1) New York law does **not** govern the extra-contractual counterclaims in the instant case, and that (2) Pennsylvania law would apply to those causes of action if Great Lakes does not prevail on its Motion for Summary Judgment.

According to its express terms, the choice-of-law provision only applies New York law interstitially to the insurance policy itself, not to Raiders' three extra–contractual claims arising

under Pennsylvania law.  The language contained in the choice-of-law provision limits the application of New York law to "[the] insuring agreement" only. Policy's choice–of–law provision states, in full:

> It is hereby agreed that any dispute arising hereunder shall be adjudicated according to well established, entrenched principles and precedents of substantive United States Federal Admiralty law and practice **but where no such well established, entrenched precedent exists, this insuring agreement is subject to the substantive laws of the State of New York**.

Ex. B (emphasis added).  Although the insurance policy's choice–of–law provision with respect to federal admiralty law is quite broad, the provision goes on to specify that "where no such well established, entrenched precedent exists, ***this insuring agreement*** is subject to the substantive laws of the State of New York." *Id*. (emphasis added). The insurance policy's choice–of–law provision, therefore, applies New York law far less expansively and much narrower — stating that if federal admiralty law does not apply, then "***this insuring agreement*** is subject to New York law."

If the parties had intended the insurance policy's choice–of–law provision to apply more broadly, they could have used language that better reflects this intent. The provision could have been written to state that "New York law will govern any dispute arising from or relating to this insurance policy." The provision could even have been written to state that "where no such well established, entrenched [federal admiralty] precedent exists, the substantive laws of the State of New York will apply." But instead of saying either of those two things, the express language of the policy's choice–of–law provision states merely that "***this insuring agreement*** is subject to New York law."

The First Circuit recently interpreted the identical language in contractual choice-of-law clause, which also happened to appear in a Great Lakes maritime insurance policy.

"Because the plain language of the choice-of-law provision is not broad enough to unambiguously encompass extracontractual claims, 'any ambiguities must be construed in favor of the insured[,]' " the First Circuit reasoned. *Great Lakes Ins. SE v. Andersson*, 66 F.4th 20, 27 (1st Cir. 2023). The First Circuit, therefore, held that the clause applied New York only to the "insuring agreement" whereas the law of the forum state governed the extra-contractual claims at issue. *Id*. at 28. "[O]nly contract-related claims are subject to the substantive laws of New York[,]" the Court of Appeals concluded, "[e]xtracontractual claims do not fall within the scope of the second clause of the choice-of-law provision." *Id*.

Accordingly, Pennsylvania law applies to Counts III, IV and V of Raiders' counterclaim, and these extra-contractual causes of action should survive Great Lakes' Motion for Summary Judgment.

## CONCLUSION

For all of the forgoing reasons, it is therefore respectfully submitted that the Motion for Summary Judgment filed by Great Lakes Insurance SE be DENIED. A genuine dispute of material fact exists as to whether Raiders breached the express warranty set forth under Article 9, Section (k) of the marine insurance Policy. Great Lakes does not contend that Raiders breached the warranty under Article 9, Section (k) because the fire extinguishing systems were not in good working order or improperly installed. Great Lakes asks this Court to end this case – dismissing Raiders breach of contract and bad faith claims – solely because the fire extinguishing equipment had not been certified or re-tagged. Granting Summary Judgment in favor of Great Lakes would impose a warranty standard upon Raiders that reaches beyond the express language of the Policy. A genuine dispute of material fact exists as to whether "certification/tagging" was "necessary" in

order to comply with the express warranty.  Granting summary judgment in favor of Great Lakes would constitute an error of law.

Respectfully submitted,


GOLDSTEIN LAW PARTNERS, LLC

BY: */s/ Shawn M. Rodgers*
    MICHAEL YANOFF, ESQUIRE
    ID No. 19384
    SHAWN M. RODGERS, ESQUIRE
    ID No. 307598
    610 Old York Road Suite 340
    Jenkintown, PA 19046
    (267) 627-2485
    myanoff@goldsteinlp.com
    srodgers@goldsteinlp.com

     *Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I, Shawn M. Rodgers, Esquire, do hereby certify that on May 6, 2024, I served a true and correct copy of Defendant's Supplemental Response in Opposition to Plaintiff's Motion for Summary Judgment, including all attachments, upon the following by email and/or electronic filing CM/ECF:

George R. Zacharkow, Esquire       Michael I. Goldman, Esquire
1601 Market St Suite 3400          8751 W. Broward Blvd Suite 404
Philadelphia, PA 19103             Ft. Lauderdale, FL 33324


*/s/ Shawn M. Rodgers*
SHAWN M. RODGERS, ESQUIRE